## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                         )

MARINA DE AGUIAR DIAS,          )
              Petitioner,         )
                                           )
      v.                                )        **CIVIL ACTION**
                                         )        **NO. 16-40049-TSH**
                                         )

LEONARDO EMMANUEL LEONOCIO DE SOUZA,  )
              Respondent.        )
_____)

## MEMORANDUM OF DECISION AND ORDER
### July 28, 2016

**HILLMAN, D.J.**

### Introduction

Marina De Aguiar Dias ("Petitioner") has filed a Verified Emergency Petition for Return of Child and Warrant of Arrest in Lieu of Writ of Habeus Corpus (Docket No. 1) ("Petition"). She seeks the return of her thirteen-year-old daughter, H.D., to Brazil pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11670 ("Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9001 *et. seq.* (formerly 42 U.S.C. §11601).  Petitioner claims that H.D.'s father, Leonardo Emmanuel Leonocio De Souza ("Respondent"), wrongfully retained H.D. in the United States.  Petitioner has also requested an order pursuant to 22 U.S.C §9007(b)(3) requiring Respondent to pay necessary expenses incurred by her during the course of these proceedings and transportation costs related to H.D.'s return to Brazil.

Respondent opposes the Petition on the grounds that: (1) Petitioner did not establish that H.D. was wrongfully retained within the meaning of Article 3 of the Convention; (2) Under Article 13(b) of the Convention, there is a grave risk that H.D.'s return would expose her to physical or psychological harm or otherwise place her in an intolerable situation; (3) Under Article 13 of the Convention, H.D. objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views; and (4) Under Article 12 of the Convention, H.D. is "well-settled" in the United States.  For the reasons set forth below, the Petition is *granted.*

## Procedural History

The Petition was filed on May 4, 2016.  *See* Docket No. 1.  Petitioner concurrently filed an Emergency Motion for *Ex Parte* Relief (Docket No. 3), requesting an order prohibiting the removal of H.D. from the jurisdiction of this Court, an order requiring immediate surrender of H.D.'s travel documents, an order directing Respondent to immediately provide Petitioner with access to H.D., and an order commanding Respondent to appear before the Court forthwith to show cause why H.D. should not be returned to her habitual residence, *i.e.* Brazil.  That motion was granted following an *ex parte* hearing held on May 6, 2016.

On May 13, 2016, the Court held a Show Cause Hearing.  Respondent, who appeared *pro se*, requested additional time to retain counsel.  That request was granted, and the Show Cause Hearing was continued until June 13, 2016.  On June 10, 2016, Respondent, through counsel, filed an Answer to Petitioner's Emergency Petition (Docket No. 12) ("Answer"). [1]  Respondent

---

[1] In his Answer, Respondent also argued that Petitioner failed to plead facts sufficient to state a claim, alluding to, but not citing, Fed. R. Civ. P. 12(b)(6), and also suggested that the return of H.D. "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," which is a defense to return enumerated by Article 20 of the Convention.  Respondent did

also filed a Demand for Trial by Jury (Docket No. 13).  On June 13, 2016, the Show Cause

Hearing was held and this Court heard testimony from Respondent, Petitioner, and Petitioner's

current husband, Marcio Faria Oliveira Martins.[2]  The Court declined Respondent's request to

hear testimony from H.D. in connection with Respondent's "grave risk" defense.  *See Kufner v.*

*Kufner*, 519 F.3d 33, 40 (1st Cir. 2008)("No part of the Hague Convention requires a court to

allow the child to testify or to credit the child's views, so the decision rests within the sound

discretion of the trial court").  Respondent's counsel did not request that this Court interview

H.D. in connection with the "mature child" defense under Article 13, which is separate and

distinct from the "grave risk" defense under Article 13(b).  Although counsel made a brief

reference to the mature child defense when requesting that the Court interview H.D., he did not

explicitly ask the Court to pursue this line of questioning with her.[3]  Moreover, he did not argue

or mention that defense in his opening statement, and there was no testimony proffered on the

issue of whether H.D. presently objects to returning to Brazil.  The Court thus finds that

Respondent waived the mature child defense under Article 13. In any event, for reasons stated

later in this opinion, I find that even if properly preserved, Respondent has also failed to establish

---

not pursue these defenses at the Show Cause Hearing, nor did he propose that this Court rule on these defenses in his Proposed Findings of Fact and Conclusions of Law submitted subsequent to the hearing.  Therefore, any such defenses are waived.

[2] Petitioner and her husband appeared via teleconference from Brazil.

[3] Respondent's counsel indicated in his opening statement that Respondent's "defense is based on Article 13(b))," the grave risk defense.  However, at the close of the hearing, when Respondent's counsel asked the Court to interview H.D., counsel stated that "one of the largest issues in the case" is "whether the child wants to stay in the United States [and] is old enough to understand on her own why that might be best for her," suggesting that he wished the Court to question H.D. in connection with an Article 13 mature child defense.  When the Court, seeking clarity, asked whether counsel was requesting testimony from H.D. on the issue of the grave risk defense, counsel said "yes," and made no further mention of the mature child defense.  Additionally, after Respondent's brief reference to the mature child defense, Plaintiff's counsel asserted that the grave risk was "the only defense raised in this proceeding."  Respondent did not object to this characterization of the defenses at issue in the proceeding.

that H.D. has attained an age and degree of maturity at which it is appropriate to consider her

views.

## Facts[4]

### *H.D.*

H.D. is a thirteen-year-old native of Brazil. *See Petition,* at *Ex. C; Answer,* at *Ex. A.*

Petitioner is H.D's biological mother, and Respondent her biological father. *See id.* At the time

of H.D.'s birth, Petitioner and Respondent lived together in Brazil as an unmarried couple. They

separated approximately three years after H.D.'s birth, and have not lived together since.

Following the separation, Petitioner and H.D. lived together in a house located in the Caixa

D'Agua ("Water Box") neighborhood of Salvador, Bahia, Brazil, which they shared with

Petitioner's parents and grandmother.[5] Respondent lived apart from H.D. and Petitioner, but

remained in Brazil until May 2013, when he moved to Massachusetts. *Resp.'s Aff.,* at ¶ 4.

On June 13, 2015, accompanied by Respondent's mother and with Petitioner's

permission, H.D. left Brazil to temporarily visit Respondent in Worcester, Massachusetts. H.D.

traveled to the United States using a round-trip plane ticket that included a return flight to

Salvador, Brazil on July 7, 2015. *See Petition,* at *Ex. A.* Respondent testified that upon H.D.'s

arrival, his mother told him that H.D.'s home in Brazil was unsanitary due to Petitioner's father

and grandmother's compulsive hoarding. According to Respondent, he then approached H.D.,

who confirmed that the mother's report was true and clearly expressed to Respondent that she

---

[4] While it is undisputed that H.D. is a habitual resident of Brazil, facts relating to H.D.'s birth and childhood are relevant to both Petitioner's claims and Respondent's defenses. Facts for which no citation is provided were elicited at the hearing.

[5] Petitioner did not provide the name of her former neighborhood to the Court, but Respondent referred to the neighborhood as "Water Box" in his testimony. I refer to Petitioner's former neighborhood as Water Box for convenience, notwithstanding the possible inaccuracy, as the name of that neighborhood is irrelevant to this matter.

wanted to stay with him in the United States. Respondent also stated in his affidavit, but did not

testify, that H.D. told him she was "afraid to return to Brazil," and that she "said repeatedly that

she is afraid in Salvador."[6] *Resp.'s Aff.,* at ¶¶ 10, 14. On June 18, 2016, Respondent and his

mother called Petitioner and asked for her permission to keep H.D. in the United States.

Petitioner declined to give her permission, but Respondent nevertheless kept H.D. in the United

States over Petitioner's objection. Since her entry into the United States on June 14, 2015, H.D.

has lived in Worcester, Massachusetts with Respondent, Respondent's wife, and Respondent's

four-year-old daughter in an apartment located in Worcester's "Main South" neighborhood. *See*

*Petition,* at *Ex. A.*

*Respondent*

Respondent represented in his Answer that he is lawfully present in the United States as

an F-1 nonimmigrant student. [7] *See Ex. B.* He testified that he is currently in the process of

changing his immigration status, and represented in his Proposed Findings of Fact and

Conclusions of Law that he "has intentions to permanently reside in the United States." He also

testified that H.D. is currently lawfully present in the United States as an F-2 dependent of a

nonimmigrant student. However, he has provided no documentation in support of that claim.[8]

---

[6] Respondent did not testify that H.D. told him she was afraid in Salvador, or indeed that H.D. told him anything relating to crime, violence, danger, or fear in Salvador. Respondent's claims concerning H.D.'s fear of return to Salvador made in his affidavit are therefore given less weight.

[7] Respondent incorrectly represents to the Court that he attached a copy of an F-1 visa to his Answer. Respondent instead attached a copy of a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, signed by a school representative on April 20, 2016 and himself on May 9, 2016. He provided no evidence that this form was submitted to the Department of Homeland Security. I note, however, that the form indicates that it is issued for the reason of "continued attendance," which supports his claim that he is in F-1 status.

[8] Respondent incorrectly represents in his Proposed Findings of Fact and Conclusions of Law that he "testified that H.D. was issued travel documents on May 26, 2015 which were good for two years." *See* Docket No., 20 at ¶ 5. Respondent's testimony did not contain any such information.

Respondent testified that he works as a web developer, and stated in his affidavit that his job is "steady and gainful."[9]

### *Petitioner and Petitioner's Husband*

Petitioner currently resides in Brazil.  She works both morning and night shifts on weekdays as a physical education teacher, and her husband works "regular commercial hours" as a systems analyst.  Petitioner and her husband have been together as a couple for about seven years, and married in May 2016.  In or around March 2016, Petitioner moved from the house she shared with her parents and grandmother (and previously shared with H.D.) in the Water Box neighborhood of Salvador to a house which she now shares with her husband and his mother in Salvador's Rio Vermelho ("Red River") neighborhood.  Both Petitioner and her husband testified that if H.D. returns to Brazil, she will stay at their current house in the Red River neighborhood, not at her former home in the Water Box neighborhood.[10]

### *H.D.'s Living Conditions in Brazil and the United States*

Respondent asserts that H.D.'s former home in the Water Box neighborhood was unsanitary due to the hoarding of Petitioner's father and grandmother.  Respondent submitted photographs of three rooms in that house depicting clutter.[11]  *Answer,* at *Ex. C,* pp. 1-3.  In

---

[9] Respondent has presented no evidence that his current employment is authorized by the United States Government.  While F-1 students are permitted to work on-campus, Respondent's Form I-20 indicates that he is not employed on-campus. *See Answer,* at *Ex. B.*  F-1 students are not permitted to work off-campus without particular authorization. *See* 8 C.F.R. §§214.2(f)(9)(ii),(f)(10) (enumerating categories of off-campus work authorization for nonimmigrant students).  Respondent has presented no evidence that he is authorized to work off-campus, or that he otherwise has employment authorization.  Based on the evidence presented by Respondent and his testimony at the hearing, I find that there is a question as to whether H.D. has legal status in this country.  Although I have not considered H.D.'s legal status in making my decision, I note that it could have ramifications in any future proceedings.

[10] Respondent acknowledged that it was his understanding that, if H.D. were to return to Brazil, she would return to the house in Red River, not the house in Water Box.

[11] While the photographs make clear that there was significant clutter at the Water Box location, the pictures do not depict an unsanitary or dangerous environment.

comparison, Respondent submitted photographs of three rooms in his current apartment, all of which appear clean.[12]  *Hearing Ex. 3.*  It is undisputed that Petitioner no longer lives at the house in the Water Box neighborhood depicted in the photographs, and likewise undisputed that she no longer lives with her parents and grandmother.  Petitioner submitted photographs of various rooms in her current home that she shares with her husband and mother-in-law in the Red River neighborhood.  *Hearing Ex. 1.*  The rooms appear clean and clutter-free.

Respondent asserts that Petitioner's father, who formerly lived with Petitioner and H.D. in the Water Box house, suffers from mental illness.[13]  Respondent testified that when he would visit the Water Box house, he would often observe Petitioner's father scream, swear, and use racist and homophobic language in front of H.D.  Respondent testified that when Petitioner's father would use this language, he was talking to himself or yelling at a nonexistent neighbor in an abandoned house.  Respondent testified that this behavior occurred daily.  Petitioner and her husband both testified that Petitioner's father does not suffer from mental illness.  It is undisputed that if H.D. returns to Brazil, she would not live with Petitioner's father.

Respondent asserts that Petitioner did not properly care for H.D. in a number of ways. He testified that H.D.'s hygiene was poor when she lived with Petitioner in Brazil.  When he would visit H.D., he would often notice that her clothing was dirty and stained.  According to

---

[12] One of the photographs submitted depicts a laptop computer and iPad on top of a desk in H.D.'s bedroom. On cross-examination, Respondent testified that if H.D. would be able to take the laptop and iPad with her if she were to return to Brazil.

[13] On cross-examination, Respondent admitted that he had filed a document with a court in Brazil, in connection with a challenge to Petitioner's temporary custody order, in which he described Petitioner's family as "good people."  He conceded that he does not believe that a racist person is a "good" person.  When asked why he would represent to the Brazilian court that Petitioner's father is a "good" person, while representing to this Court that he would frequently use racist and homophobic language, Respondent answered that he did not think it relevant to mention Petitioner's father's behavior to the Brazilian court because those proceedings weren't about "defining custody."  This explanation is unconvincing and undercuts the reliability of his testimony.

Respondent, H.D. would be so unclean that he often felt compelled to bring her to his house, bathe her, and change her clothes.  He testified that when H.D. came to the United States, he and his wife had to "always" remind her to bathe herself, and also had to teach her to brush her hair and teeth on a regular basis.  Petitioner did not testify on the subject of H.D.'s hygiene.

Respondent also claims that H.D. did not have an adequate social life when she lived in Brazil.  When H.D. was not in school, she would usually stay home, watch TV, and play video games.  He testified that when he would call H.D. on weekends, she would often be at her house by herself, while Petitioner and her husband (then-fiancee) would be out "traveling" together.  Petitioner's husband testified, to the contrary, that he and Petitioner would spend time with H.D. on weekends.  According to Respondent, H.D. is now a member of a church youth group, recently started attending jiu-jitsu classes, and generally has a more active social life than she had in Brazil.

Petitioner and Respondent agree that H.D.'s grades, particularly in math, were poor when she lived in Brazil.[14]  During the 2015-2016 school year, H.D. attended Sullivan Middle School in Worcester, Massachusetts, where her grades generally improved; Respondent submitted a report card from Sullivan showing exemplary grades, except for an "F" in math in one quarter.  *Hearing Ex. 4*, at p. 2.  Respondent testified that after H.D. came to the United States, he bought her books to teach her a "home-based" math education program called "Kumon."  He observed that the Kumon program helped H.D. improve her skills in math.[15]  Petitioner testified that H.D. had a math tutor and was receiving extra help in math before she left for the United States.

---

[14] The amount of time during which H.D.'s grades suffered was disputed by the parties.  Petitioner testified that she received poor grades in math for a period of six months, whereas Respondent testified that she had always received poor grades in math.

[15] On cross-examination, Respondent testified that he could ship the Kumon books to H.D. in Brazil if she were ordered returned.

Petitioner testified that if H.D. is returned to Brazil, she will attend a school called "Integral." According to Petitioner, schooldays at Integral consist of academic classes in the morning and extracurricular activities in the afternoon, including swimming and martial arts.

Respondent offered evidence concerning crime and violence in Salvador.  He cited a statistic in his affidavit indicating that "with approximately 60 homicides for every 100,000 people, Salvador's murder rate is more than double that of Rio De Janeiro which has 21.5 murders per 100,000 people," *Resp.'s. Aff.,* at ¶ 15, and testified that Salvador is located in a particularly dangerous region of Brazil.  When asked during direct examination whether there was "any reason, if any, why [he] came to the United States," Respondent answered that he came to the United States because of violence in Brazil, including in Salvador.[16]

Respondent asserts that both the Water Box and Red River neighborhoods in Salvador are dangerous.[17]  He submitted photographs of the area outside H.D.'s former house in the Water Box neighborhood.  *See Answer,* at *Ex. C,* p. 4-8; *Hearing Ex. 2.*  The photographs depict some dilapidated buildings, graffiti, and a tall wall separating what is presumably H.D.'s former house from the street.[18]  It was undisputed at the hearing that if H.D. returns to Brazil, she will not live in the Water Box neighborhood. Regarding the Red River neighborhood, Respondent testified

---

[16] Respondent's claim that he came to the United States to escape violence in the entire country of Brazil is tempered by his attestation on his Form I-20, signed on May 6, 2016, that he intended to remain only temporarily in the United States. Further, in order to be granted F-1 nonimmigrant student status, an alien must prove to the Government that he has a "residence in a foreign country which he has no intention of abandoning." 8 U.S.C. §1101(a)(15)(f)(i).

[17] Just as Respondent asserted to the Brazilian court that H.D.'s father was a "good person," yet represented to this Court that he frequently uses racist and homophobic language, Respondent likewise admitted on cross-examination that he described the Water Box neighborhood in a document filed with the Brazilian court as a "good neighborhood," yet represented to this Court that H.D. would face a grave risk of physical or psychological harm if she were to return there.  His explanation for this inconsistency was that a "good neighborhood doesn't mean a safe neighborhood." This explanation is unconvincing, and again calls into question the reliability of his testimony.

[18] Respondent testified that his mother took these photographs in or around May 2016, approximately two months after Petitioner had moved out of the neighborhood. The photographs of the neighborhood do not depict a dangerous environment.

that he is familiar with the level of criminal activity and danger in that area because he once lived

in a neighborhood called Amaralina, which is apparently near Red River.  Although he has not

lived in Salvador since 2013, he claimed that he is aware of the present danger in Salvador

because, in addition to previously living in the city for more than 14 years in the aggregate, he

also watches the news from Brazil and Salvador every day.[19]  Respondent named two "favelas,"

or slum neighborhoods, called "Vale Das Pedrinhas" and "Nordeste," which he claimed were

located "in the Red River area."  He testified that these two neighborhoods are "extremely

dangerous" and controlled by drug traffickers.  He testified that there are "many other"

dangerous areas in or near the Red River neighborhood, but did not name or describe those other

areas. Petitioner's husband testified that the area of Red River in which his house is located is

"calm," and is "considered a mid- to high-income level neighborhood."  He testified that the

safety in the neighborhood is "excellent."

### *H.D.'s Maturity and Alleged Objection to Return*

I summarize the evidence in the record pertaining to Respondent's Article 13 mature child

defense, which is scarce due to Respondent's counsel's failure to pursue the defense at the Show

Cause Hearing.  Respondent testified that, at some point between June 14, 2015, and June 18,

2015, H.D. expressed a desire to remain with him in the United States. Petitioner testified that,

after H.D.'s departure from Brazil, she "found out through [H.D.'s] colleagues that she had plans

of staying" in the United States. However, there is no evidence in the record of H.D.'s present

objection to return.  Neither Respondent nor Petitioner offered any testimony concerning whether

---

[19] On cross-examination, Respondent testified that he was unaware of any criminal activity in Worcester's Main South neighborhood, where he currently lives with H.D.  Respondent testified that he sometimes watches the local Worcester news, but was unaware of a number of recent reports of violent and drug-related crime in the Main South neighborhood referred to by Petitioner's counsel.

H.D. presently objects to return, and Respondent did not even claim that H.D. presently objected to return in his affidavit submitted with his Answer.  In support of H.D.'s maturity, Respondent submitted a letter from H.D's jiu-jitsu instructor, dated May 26, 2016, which states that H.D. "possesses a maturity we don't usually see in young ladies her age."[20]  *Answer,* at *Ex. F.*

*Custody of H.D.*

Facts relating to the parties' respective custody rights are relevant to a wrongful retention analysis.  In August 2015, Petitioner filed for custody of H.D. in the 5th Probate and Family Court in the District of Salvador, State of Bahia, Brazil.  On September 14, 2015, that court entered an order "temporary custody" for Petitioner.  It is undisputed that Petitioner had custody rights over H.D. prior to the temporary custody order.[21]  However, the exclusivity of her custody rights prior to September 14, 2015 is in dispute.  Respondent represents is his Proposed Findings of Fact and Conclusions of Law, without any cite to the record, that he "testified that he and [Petitioner] shared legal parental rights at the time H.D. arrived in the United States."  *See* Docket No. 20, at ¶ 7.  In Petitioner's Proposed Findings of Fact and Conclusions of Law, Petitioner represents that she had always possessed "unilateral" legal custody as defined by Article 1.583 of the Brazilian Civil Code, and that those unilateral rights were "reaffirmed" by the September 14, 2015 court order.  *See* Docket No. 19, at ¶ 11.  However, the court order submitted by Petitioner does not indicate that unilateral legal custody rights were being reaffirmed.

---

[20] Respondent testified at the June 13, 2016, Show Cause Hearing that H.D. had "just started" jiu-jitsu lessons. Although she apparently attends classes three times per week, the limited period of time during which the instructor has known H.D. diminishes the probative value of the letter.

[21] Respondent claimed in his Answer that Petitioner had no legal custody rights over H.D. at the time of retention. *Answer,* at ¶ 30.  However, he stipulates that Petitioner had custody rights in his Proposed Findings of Fact and Conclusions of Law, where claims that he shared legal custody rights with Petitioner at the time of retention. *See* Docket No. 20, at ¶ 7.

## Discussion

### Standard of Review

"Under the Hague Convention, children who have been wrongfully removed or retained must be returned to their country of habitual residence unless the abductor can prove one of the defenses or exceptions to return allowed by the Convention." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002)(citations omitted).  In order to establish wrongful retention or removal, a petitioner must establish by a preponderance of the evidence that he or she: (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal or retention, and (3) was exercising those rights at the time of removal or retention, or would have exercised those rights but for the removal or retention.  *See Mendez v. May*, 778 F.3d 337, 343 (1st Cir. 2015); Convention, art. 3; 22 U.S.C. §9003(e)(1)(A).

### Whether H.D. Was Wrongfully Retained

It is undisputed that Petitioner seeks to return H.D. to Brazil, her country of habitual residence, and also undisputed that Petitioner had custody rights immediately prior to H.D.'s retention.  Respondent nonetheless argues that his retention of H.D. was not wrongful because Petitioner was not *exercising* her custody rights at the time of the retention.  Respondent contends that, because he shared custody rights with Petitioner (a fact which Petitioner disputes), and because H.D. was in his care immediately before she was retained, *he* was the parent exercising custody rights over H.D. at the time of retention, not Petitioner.  *See* Docket No. 20, at ¶ 15-17.  I find that, even assuming that Respondent shared custody rights with Petitioner at the time of retention, his retention of H.D. was wrongful within the meaning of the Convention.

"The Hague Convention does not define what constitutes the 'actual exercise' of custody rights." *Mendez v. May*, 85 F.Supp.3d 539, 555 (D.Mass. 2015), *rev'd on other grounds*, 778

12

F.3d 337 (1ˢᵗ Cir. 2015)(citation omitted).  "Nonetheless, courts have only found failure to exercise custody rights on the part of someone such rights where there were actions 'that constituted clear and unequivocal abandonment of the child.'"  *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6ᵗʰ Cir. 1996)).  Additionally, "a court may find that [a petitioner] would have exercised her rights if she 'persistently sought custody,' including petitioning for custody in her country of residence."  *Moura v. Cunha*, 67 F.Supp.3d 493, 498 (D.Mass. 2014)(quoting *Kufner,* 519 F.3d at 39-40); *see e.g. Hazbun Escaf v. Rodriquez*, 200 F.Supp.2d 603, 612-13 (E.D.Va. 2002)(finding that mother would have exercised custody rights but for retention where she "promptly and steadfastly objected to the retention and vigorously pursued steps to compel the child's return.")

I find that Petitioner would have exercised her custody rights but for Respondent's retention. There is no evidence that Petitioner clearly and unequivocally abandoned her child. She permitted H.D. to travel to the United States under the belief that H.D. would return within a month, and, when asked, declined to give Respondent permission to keep H.D. in the United States.  In August 2015, she petitioned for custody of H.D., and was awarded temporary custody in September 2015.  That Respondent may have been exercising his own custody rights at the time of retention does not make the retention any less wrongful. As the United States Department of State noted in its legal analysis of the Hague Convention:

> "[F]rom the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other [] is wrongful, and this wrongfulness derives in this particular case [] not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have

subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties."

*Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed.Reg. 10,494, 10,506 (Mar. 26, 1986).  The Department of State's analysis discusses removal, but it is clear that the same principle must also apply to retention.  Respondent interfered with Petitioner's exercise of her custody rights when he unilaterally acted to keep H.D. out of Brazil, her country of habitual residence.  Therefore, I find that Respondent's retention of H.D. was wrongful within the meaning of the Convention.

<u>*Respondent's Defenses to Return*</u>

Respondent invokes three defenses to return: the "grave risk" defense under Article 13(b), the "mature child" defense under Article 13, and the "well-settled" defense under Article 12.  *See* Docket No. 20, at ¶¶ 15-21.  "The Convention establishes a strong presumption favoring return of a wrongfully removed child," and consequently, "exceptions to the general rule of expedient return . . . are to be construed narrowly."  *Danaipour*, 286 F.3d at 13-14 (citations omitted).  This Court may exercise its discretion to order removal even if it is found that one or more of these defenses apply. Convention, art. 18; *see also Friedrich*, 78 F.3d at 1067.

*Grave Risk Defense under Article 13(b)*

To succeed on a "grave risk" defense, the respondent must prove by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Convention, art. 13(b); 22 U.S.C. §9003(e)(2)(A).  The risk must be "more than serious," though it need not be "immediate." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000).  The harm involved "must be a great deal more than minimal." *Id.*; *see Moura*, 67 F.Supp.3d at 500 ("[I]n the absence of clear

14

abuse, courts are unlikely to block removal under [Article 13(b)]); *Blondin v. Dubois* 238 F.3d

153, 162 (2$^d$ Cir. 2001)(noting that "elimination of certain educational or economic

opportunities" does not constitute a grave risk of harm).  "[W]hen determining whether a grave

risk of harm exists, courts must be attentive to the purposes of the Convention." *Walsh,* 221 F.3d

at 218.  The grave risk defense "was not intended to be used by defendants as a vehicle to litigate

(or relitigate) the child's best interests." *Danaipour*, 286 F.3d at 14 (citation omitted).  Because

courts are not permitted to engage in custody determinations, it is not relevant who the better

parent would be in the long run.  *Id*.

Respondent has failed to establish by clear and convincing evidence that H.D.'s return

would subject her to a grave risk of harm or otherwise place her in an intolerable situation.

Respondent testified that areas "around" the Red River neighborhood where H.D. will

presumably return are extremely dangerous and controlled by drug traffickers, but did not

demonstrate by clear and convincing evidence that H.D. would face a grave risk of harm due to

the violence in those areas.  *Cf. Velasquez v. Funes de Velasquez*, 102 F.Supp.3d 796, 811-13

(E.D.Va. 2015)(finding return to El Salvador constituted grave risk of harm where evidence

showed that El Salvador was "one of the most dangerous and violent countries in the world" and

family of petitioned-for children were victims of multiple violent threats).  On the contrary,

Respondent testified that he believes H.D., while not in school, would spend the majority of her

time inside her house if she were to return to Brazil, and Petitioner likewise testified that when

H.D. previously lived in Brazil, she was not allowed to walk outside without adult supervision.

Moreover, Petitioner's husband testified that the house to which H.D. will return is located in a

calm, middle-class neighborhood, and this testimony was uncontroverted by Respondent's

testimony, which focused on slum neighborhoods "around" the Red River area.  Respondent's

vague reference to "many other" dangerous areas, which were unnamed and not described, is not sufficient to carry his burden, particularly in light of the previously noted concerns regarding his credibility. *See notes* 13, 17, *supra* at pp. 7, 9.

Respondent has also failed to show by clear and convincing evidence that H.D.'s living conditions in Salvador would constitute a grave risk of physical or psychological harm or lead to an otherwise intolerable situation.  Respondent claimed that H.D.'s former home was unsanitary due to the compulsive hoarding of Petitioner's father and grandmother.  It is undisputed that if H.D. returns to Brazil, she will not live with Petitioner's father and grandmother.  Respondent claimed that H.D. would be at risk due to exposure to her allegedly mentally ill grandfather.  Even assuming the truth of Respondent's disputed allegations, it is undisputed that if H.D. returns, she will not be living with her grandfather.  Respondent makes much of his laudable involvement in H.D.'s improved academic performance, stronger social network, and better personal hygiene.  However, as the First Circuit has stated, it is not relevant who the better parent would be in the long run, and Article 13(b) may not be used as a "vehicle to litigate the child's best interests." *Danaipour*, 286 F.3d at 14.  Respondent's claim that H.D.'s isolation in Brazil would result in a grave risk of harm or an otherwise intolerable situation due to isolation also fails.  It is undisputed that H.D. will attend school outside of her house, and Petitioner testified that the school which H.D. would attend offers extracurricular activities, including athletics.  Living in Salvador with Petitioner may reduce or even eliminate H.D.'s freedom to walk in the street unaccompanied by an adult, but an "intolerable situation was not meant to encompass return to a home where living conditions are less palatable*," Avendano v. Smith*, 806 F.Supp.2d 1149, 1176 (D.N.M. 2011)(citation omitted), and the situation envisioned by Respondent— where H.D. would spend most of her free time at home watching television and playing video

16

games—does not approach a showing of "clear abuse."  In sum, taking into account the evidence presented concerning H.D.'s potential living conditions and the general environment in the city to which she plans to return, I find that Respondent has failed to establish by clear and convincing evidence that H.D.'s return to Brazil would expose her to a grave risk of physical or psychological harm or otherwise place her in an intolerable situation.

<em>Mature Child Defense under Article 13</em>

The Court will address the merits of Respondent's mature child defense under Article 13 notwithstanding counsel's failure to pursue that defense at the Show Cause Hearing.[22]  "To succeed on a [mature child] affirmative defense, a respondent must prove by a preponderance of the evidence 'that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'"  *Falk v. Sinclair*, 692 F.Supp.2d 147, 159 (D.Me. 2010)(quoting Convention, art. 13); *see* 22 U.S.C. 9003(e)(2)(B).  "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case by case basis."  *Falk*, 692 F.Supp.2d at 159 (quoting *Yang v. Tsui*, 499 F.3d 259, 279 (3ᵈ Cir. 2007)).

It is reasonable to believe that, based on Petitioner and Respondent's testimony, H.D. did not want to return to Brazil at the time of her entry into the United States in June 2015. However, the only evidence that H.D. currently objects to return consists of unsupported representations by Respondent.  I find that Respondent has not proven by a preponderance of the evidence that H.D. objects to return, and decline to assume the child's objection based on

---

[22] As noted above, Respondent's counsel briefly referenced the language of the mature child defense at the close of the hearing. However, he then reiterated that he was seeking to have the Court interview H.D. in connection with the grave risk defense, and made no further mention of the mature child defense.

Respondent's representations alone.  *Cf. Kufner v. Kufner*, 480 F.Supp.2d 491, 502 (D.RI. 2007)(assuming that petitioned-for children, if asked, would object to return where children "stated consistently" their desire to remain in United States to court-appointed guardian *ad litem*), *aff'd on other grounds*, 519 F.3d 33 (1ˢᵗ Cir. 2008).  Moreover, I find that Respondent has not proven by a preponderance of the evidence that H.D. is of a sufficient age and maturity for this Court to take her views into consideration.  While H.D.'s exemplary grades and letter from her jiu-jitsu instructor may be probative of maturity, they are not sufficient to carry Respondent's burden.  To hold that this defense applies would involve assuming both the child's present objection and the content of the child's views based solely upon representations by the party opposing return.  To assume as much would be inconsistent with the "narrowness of the age and maturity exception to the Convention's rule of mandatory return." *Gonzalez Locicero v. Nazor Lurashi*, 321 F.Supp.2d 295, 298 (D.PR. 2004).  I thus find that Respondent has failed to establish that relief is warranted under Article 13's mature child defense.

### *Well-Settled Defense under Article 12*

Respondent's well-settled defense under Article 12 is barred by the plain language of the Convention's text.  "To succeed on a 'well-settled' affirmative defense, a respondent must prove by a preponderance of the evidence that the Hague Convention proceeding was commenced more than one year after the child's wrongful removal (or retention) and that the child has become well-settled in his or her new environment." *Falk*, 692 F.Supp.2d at 158-59; *see* Convention, art. 12; 22 U.S.C. §9003(2)(B).  Under the ICARA, proceedings are commenced when a petition for the return of a child is filed "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  22 U.S.C. §§9003(b); *see also* 22 U.S.C. 9003(f)(3).  H.D. was

retained by Respondent in June 2015.  Petitioner filed her Petition with this Court on May 4,

2016.  H.D. was at the time of filing, and still is, located in Worcester, Massachusetts, within the

jurisdiction of this Court. Proceedings were therefore commenced less than one year after the

child's wrongful retention. Accordingly, relief is not warranted under Article 12's well-settled

defense.

### *Petitioner's Request for Award of Necessary Expenses*

As the prevailing party, Petitioner has established the prerequisite for an award of

necessary expenses under the fee-shifting provision of the ICARA, which provides that:

> Any court ordering the return of a child pursuant to an action brought under
> section 9003 of this title shall order the respondent to pay necessary expenses
> incurred by or on behalf of the petitioner, including court costs, legal fees, foster
> home or other care during the course of proceedings in the action, and
> transportation costs related to the return of the child, unless the respondent
> establishes that such order would be clearly inappropriate.

22 U.S.C. §9007(b)(3).  However, "two issues remain: first, whether the claimed

expenses are 'necessary,' and second, whether an order against respondent would be 'clearly

inappropriate.'"  *De Souza v. Negri*, No. 14-13788-DJC; 2015 WL 727934, at *2 (D.Mass.

February 19, 2015)(citation to quoted case and alterations omitted).  "The burden of proof to

establish necessity is upon the Petitioner."  *Id.* (citation omitted).  The burden to establish that a

fee award would be "clearly inappropriate" is upon the Respondent.  *Id.*  Accordingly, Petitioner

has until August 11, 2016 to file a motion enumerating what she alleges are "necessary"

expenses, and Respondent in turn has until August 25, 2106 to respond to the motion and address

whether any such award would be "clearly inappropriate."

### Conclusion

Petitioner's Verified Emergency Petition for Return of Child is _**granted**_. Respondent is _**ordered**_ to return H.D. to the custody of Petitioner in Brazil forthwith, and at no date later than twenty-one (21) days from the entry of this Order. It is _**further ordered**_ that, upon request, H.D.'s passport be returned to the custody of Petitioner's counsel, who will deliver that passport to H.D. prior to her return flight to Brazil.  Nothing in this Order shall prevent the relevant courts in Brazil from making an independent determination with respect to the custody of H.D.

SO ORDERED.


 **/s/ Timothy S. Hillman**
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**

20